UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| TEAMSTERS LOCAL 237 WELFARE FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| SERVICEMASTER GLOBAL HOLDINGS, INC., NIKHIL M. VARTY and ANTHONY D. DiLUCENTE, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Teamsters Local 237 Welfare Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ServiceMaster Global Holdings, Inc. ("ServiceMaster" or the "Company"), Company releases and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of all purchasers of ServiceMaster common stock between February 26, 2019 and November 4, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act") against ServiceMaster and the Company's most senior executives.

2.     ServiceMaster provides services to residential and commercial customers in the termite, pest control, cleaning and restoration markets.  ServiceMaster's largest and most profitable business segment is Terminix, a termite and pest control business that operates primarily in the United States.  In 2019, the Terminix segment represented approximately 87% of the Company's revenues.  Among other services, Terminix offers an annual coverage plan for its termite customers that indemnifies the customer against the cost of treatment and repairs.

3.     Adjusted EBITDA in the Company's Terminix segment declined to $330 million in its fiscal 2017, an 11% year-over-year decline.  In an effort to turn the segment around, ServiceMaster revamped the management of its Terminix business, tasking defendants Nikhil M. Varty ("Varty"), ServiceMaster's then-newly appointed Chief Executive Officer ("CEO"), and

Anthony D. DiLucente ("DiLucente"), ServiceMaster's Chief Financial Officer ("CFO"), with revitalizing growth in the Terminix business with a focus on customer service and operations.

4.     Defendants assured investors during the Class Period that ServiceMaster was successfully executing its transformation plan for the Terminix business and that results in the segment would drive positive trends in the second half of 2019. Behind the scenes, however, the Terminix business had been beset by costly termite litigation for the past several years, primarily related to Formosan activity in Mobile, Alabama. The Formosan termite is an invasive termite species native to Southern China. Not only had damage from Formosan termite infestations materially impacted ServiceMaster's results and operations, but, unbeknownst to investors, the Company had been taking measures to mitigate this trend since at least early 2018. These undisclosed adverse facts rendered defendants' positive Class Period statements regarding the Company's Terminix business materially false and misleading.

5.     On October 22, 2019, ServiceMaster announced disappointing preliminary financial results for the third quarter of fiscal 2019. The Company stated that it had generated net income of only $25 million, a 65% year-over-year decline, during the quarter. The Company also revised downward its projected full-year adjusted EBITDA to a range of $415 to $425 million, down from $435 to $445 million. The Company blamed the poor results on losses stemming from Formosan termite activity in Mobile, Alabama. Shockingly, ServiceMaster revealed that the issues had been going on "over the last few years" and had grown so bad that the Company had made numerous operational changes over the preceding 18 months. In addition, the Company announced the sudden departure of Matthew J. Stevenson, President of Terminix Residential, effective October 31, 2019.

6.     On this news, the price of ServiceMaster shares declined over 20%.

7.     On November 5, 2019, ServiceMaster issued a release announcing its third quarter 2019 financial results.  In the release the Company discussed its "'challenging quarter,'" stating that it had been impacted by certain "legacy risks," including "termite damage claims."

8.     That same day, defendants held an earnings call to discuss the results.  During the call, defendant Varty revealed that the increase in termite litigation – which occurred "[i]n the past few years" – had impacted termite revenue by 7% to 8%, roughly double the historical impact.  Defendant Varty also stated that increased claims would continue to impact the Company throughout 2020.  Defendant DiLucente disclosed that, in addition to "$2 million in increased damage claims expense due to the increase in Formosan termite activity in the Mobile, Alabama area," the Company "expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter."

9.     On this news, the price of ServiceMaster shares declined 9%.

10.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as defined below) purchased ServiceMaster common stock at artificially inflated prices and suffered damages when the relevant truth was revealed.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Defendant ServiceMaster transacts business in this District, and many of the acts charged

herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

**PARTIES**

15.     Plaintiff Teamsters Local 237 Welfare Fund, as set forth in the accompanying certification, purchased ServiceMaster common stock during the Class Period and was damaged thereby.

16.     Defendant ServiceMaster provides pest control, cleaning and restoration services to residential and commercial customers.  Headquartered in Tennessee, the Company's shares trade on the NYSE under the ticker symbol "SERV."

17.     Defendant Nikhil M. Varty served as CEO of ServiceMaster during the Class Period. On January 21, 2020, ServiceMaster announced the sudden departure of defendant Varty.

18.     Defendant Anthony D. DiLucente served as CFO and Senior Vice President of ServiceMaster during the Class Period.

19.     The defendants referenced above in ¶¶7-18 are referred to herein as the "Individual Defendants."   The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of ServiceMaster securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ServiceMaster's quarterly reports, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and releases alleged herein to be misleading prior to

- 4 -

or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Defendants are liable for: (i) making false statements; and (ii) failing to disclose adverse facts known to them about ServiceMaster. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ServiceMaster securities was a success, as it: (i) deceived the investing public regarding ServiceMaster's prospects and business; (ii) artificially inflated the price of ServiceMaster stock; and (iii) caused plaintiff and other members of the Class to purchase ServiceMaster stock at artificially inflated prices.

## FACTUAL BACKGROUND

21.     ServiceMaster describes itself as a leading provider of essential services to residential and commercial customers in the termite, pest control, cleaning and restoration markets, operating through an extensive service network of more than 8,000 company-owned locations and franchise and license agreements, including in Nashville.

22.     The Company's portfolio of brands includes AmeriSpec (home inspections), Copesan (commercial national accounts pest management), Furniture Medic (cabinet and furniture repair), Merry Maids (residential cleaning), Nomor (European pest control), ServiceMaster Clean (commercial cleaning), ServiceMaster Restore (restoration), Terminix (residential termite and pest control), and Terminix Commercial (commercial termite and pest control).

23.     Terminix is ServiceMaster's largest and most profitable business segment.  In 2018, Terminix accounted for approximately 87% of the Company's revenue and 79% of the Company's total reportable segment adjusted EBITDA.  Moreover, approximately 80% of Terminix's revenue is generated from the annual renewal of customer contracts.  Therefore, the retention of Terminix customers is critical to ServiceMaster's financial health.

24.     As part of its efforts to attract and retain customers seeking long-term subterranean termite solutions, Terminix offers an annual coverage plan for its customers.  To enter into such plans, Terminix offers a complimentary initial inspection to assess whether the property has an existing infestation to determine customer eligibility.  Then, upon entering into the contract, Terminix provides another inspection annually and further inspections on an as-needed basis.  Should termites be discovered at any time, Terminix agrees to eliminate the infestation at no cost, additionally covering the costs of further treatment as well as damages and repairs.

25.     Due to the importance of Terminix to ServiceMaster's financial results, ServiceMaster previously underwent a turnover of key management following slowing growth in the Terminix business in 2017.  The new management, led by defendant Varty as CEO, was tasked with revitalizing growth in the ailing business with a focus on customer service and operations.

26.     On July 31, 2017, defendant Varty participated in his first Company earnings call with investors, analysts, and the media.  On the call, defendant Varty touted his "extensive experience leading large organizations and driving revenue and growth profitability, including some service businesses."  Further, defendant Varty stated that it was "clear to [him]" that there was "significant opportunity to unlock value at ServiceMaster by sharpening [its] focus on results [and] on operational excellence."

27.     Unbeknownst to investors, however, a major obstacle stood in the way of defendants'

turnaround plan: the Formosan termite.  Several decades ago, the Formosan species of termite,

commonly referred to as the "super termite," was first introduced to the United States.  Since then,

the Formosan has been considered the most aggressive and economically devastating species of

termite in the United States, causing approximately one billion dollars a year in property damage.

Like other subterranean termites, the Formosan feeds on materials that contain cellulose, but because

of its larger colony size, the Formosan attacks a greater variety of wood at a faster rate than

subterranean termites native to the United States.  And the Formosan has an enormous reproductive

capacity, with a typical colony easily exceeding one million insects.

28.     In the United States, the Formosan exists in warm, humid climates, and is commonly

found in Gulf Coast states, such as Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.

The Formosan has also been found in North Carolina, South Carolina, Hawaii, and California.  In

2017, Terminix reported that Mobile, Alabama had suffered the highest level of Formosan

infestation.

29.     Similar to all subterranean termites, the Formosan constructs shelter tubes out of mud

to travel from its underground nest to a food source.  The Formosan also uniquely constructs above-

ground nests within the structures it infests.  In the context of a structural infestation, these nests are

typically found within walls and are referred to as "cartons" in the pest control industry.  The

possibility of both a Formosan nest close to a structure and an above-ground nest within the structure

can greatly increase the damage potential of these termites.  Accordingly, it is imperative to closely

monitor and promptly treat any sign of Formosan activity.  Property owners in at-risk areas therefore

rely heavily on Terminix's annual protection contracts to safeguard against catastrophic damage

from a Formosan invasion.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

30.     The Class Period begins on February 26, 2019. On that date, ServiceMaster reported its financial results for the fourth quarter of 2018. In its release, ServiceMaster provided full-year 2019 revenue guidance of $2.02 to $2.05 billion, or an increase of 6% to 8% compared to 2018, as well as adjusted EBITDA guidance of $435 to $445 million. The Company also projected organic revenue growth at Terminix in the range of 2% to 3%. Defendant Varty was quoted in the release, touting the Company's purportedly successful execution of its transformation plan, stating in part:

> "Our primary goal in 2018 was to transform our Terminix business and unlock the potential to drive sustainable revenue growth. We are pleased to report that our focused efforts throughout 2018 and strategic initiatives resulted in record revenue at Terminix in the fourth quarter and full year 2018," said ServiceMaster Chief Executive Officer Nik Varty. "Improvements in pest sales, driven by enhanced marketing initiatives, and stronger start and completion rates drove organic growth of 5 percent during the quarter, including over 7 percent in residential pest for a second consecutive quarter."

31.     That same day, ServiceMaster held a conference call with investors and analysts to discuss the Company's fourth quarter 2018 financial results. On the call, defendant DiLucente stated that among the "other cost drivers in the quarter" was a "$2 million . . . damage claims expense increase, predominantly related to activity in a section of the Gulf Coast."

32.     During the call, defendant Varty emphasized that the Terminix transformation plan was being executed successfully, creating a "long-term sustainable business model." He stated in part:

> We made tremendous progress on the core business in 2018, while taking on an increased workload to deliver on the spin, which was a major commitment to our shareholders. Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high. With 5% organic growth in the quarter, we are approaching industry-level growth rates and have direct line of sight to 30% incremental margins. We are focused on improving profitability in the Terminix business, but we are approaching the next steps in a strategic, disciplined manner. We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer

- 8 -

service levels and, ultimately, a declining growth rate. We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth, both organically and through acquisitions, to the bottom line. By focusing on our mission of creating cleaner, healthier, safer environments for our customers at home, work and play, we can deliver on our future commitments just as we have done in 2018, and I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value.

33.     On March 1, 2019, ServiceMaster filed its annual report on Form 10-K with the SEC, which was signed and certified by defendants Varty and DiLucente. The Form 10-K discussed the importance of Terminix customer renewals and explained that the Company's long-term termite service plan was key to its competitive advantage, stating in pertinent part:

> Approximately 80 percent of Terminix revenue comes from customers who enter into contracts with the option to renew annually. Typically, termite services require an initial inspection and the installation of a protective liquid barrier or bait stations surrounding the home. The protection plan contracts provide a guarantee for the repair of new damage resulting from termite infestation. After the first year, a customer has the option to renew the contract at a significantly reduced cost that extends the guarantee. Consequently, revenue generated from a renewal customer is less then [sic] revenue generated from a first-year termite customer.

> We believe that the strength of the Terminix brand, along with our history of providing a high level of consistent service, allows us to enjoy a competitive advantage in attracting, retaining and growing our customer base. We believe our investments in systems and processes, such as routing and scheduling optimization, robust reporting capabilities and mobile customer management solutions, enable us to deliver a higher level of customer service when compared to smaller regional and local competitors.

> Our focus on attracting and retaining customers begins with our associates in the field, who interact with our customers every day. Our associates bring a strong level of passion and commitment to the Terminix brand, as evidenced by the 9-year and 8-year average tenure of our branch managers and technicians, respectively. Our field organization is supported by dedicated customer service and customer care center personnel. Our culture of continuous improvement drives an intense focus on the quality of the services delivered, which we believe produces high levels of customer satisfaction and, ultimately, customer retention and referrals.

34.     The Form 10-K also included a section titled "Significant Accounting Policies," which discussed certain "significant areas requiring the use of management estimates," including "accruals for termite damage claims." According to the Form 10-K, there were "no changes in the

significant areas that require estimates or in the underlying methodologies used in determining the

amounts of these associated estimates" with respect to termite damage claims. The Form 10-K

stated in pertinent part:

> The preparation of the consolidated financial statements requires management to make certain estimates and assumptions required under GAAP which may differ from actual results. The more significant areas requiring the use of management estimates relate to revenue recognition; the allowance for uncollectible receivables; accruals for self-insured retention limits related to medical, workers' compensation, auto and general liability insurance claims; accruals for termite damage claims; the possible outcome of outstanding litigation; accruals for income tax liabilities as well as deferred tax accounts; the deferral and amortization of customer acquisition costs; share based compensation; useful lives for depreciation and amortization expense; the valuation of marketable securities, including the valuation of retained shares of Frontdoor common stock; and the valuation of tangible and intangible assets. In 2018, there were no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates, other than the valuation of our retained shares of Frontdoor common stock.

35.     The Form 10-K further explained the Company's procedures for accounting for

termite damage claim accruals, stating in part:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

36.     On May 7, 2019, ServiceMaster issued a release announcing its financial results for

the first quarter of 2019 and affirming its full-year 2019 guidance. Defendant Varty was quoted in

the release, specifically referring to "positive trends" in Terminix and stating in part:

> "Our solid performance in the quarter reflects the consistent progress we are making on executing our strategic initiatives," said ServiceMaster Chief Executive Officer Nik Varty. "In our pest control core, organic growth of 3 percent in the quarter included 4 percent growth in residential pest and 2 percent in termite and home services, despite the impact of unseasonably cold weather and flooding on our operations and lead flow. We see positive trends in commercial pest with customer retention reaching three-year highs, driven by continued improvement in customer service as we leverage the best practices of Copesan and enhance the customer

experience we deliver. ServiceMaster Brands grew revenue organically 5 percent in the first quarter. Our focus on high-growth market verticals is paying dividends with healthcare cleaning and disinfection up 7 percent and commercial restoration up 35 percent in the quarter. Strategic M&A also continues to be a growth driver, with 11 pest control acquisitions in the quarter."

37. That same day, the Company held a conference call with investors and analysts to discuss the Company's financial results. During the call, defendant Varty again stated that the Company was successfully executing upon its enhanced customer service initiatives, which were key to ServiceMaster's transformation plan, stating in part:

Underlying all of these initiatives is reimagining the customer experience. Excellent customer service, easy to talk about but incredibly difficult to consistently deliver. My job as a leader of ServiceMaster is to empower our customer-facing employees with the training, tools and motivation needed to deliver consistently excellent customer service at every touch point. We are creating a culture obsessed with service delivery. And while that mindset will take time to permeate throughout our organization, we are already making great strides.

38. In addition, defendant DiLucente emphasized the growing margin expectations for the Terminix business and represented that "the second half of 2019" would entail "a positive inflection point" in year-over-year adjusted EBITDA, stating in part:

Including the additional investments in growth in Terminix, we expect incremental margins of the business to contribute approximately 30%, excluding a $11 million of dis-synergies and $9 million of additional cost related to the Salesforce implementation. It's important to note that 30% incremental margins are for the full year and we'll increase throughout the year as productivity initiatives are realized and retention rates continue to improve.

We expect a positive inflection point in our year-over-year adjusted EBITDA margins in the second half of 2019 as a result of revenue conversion more than offsetting dis-synergies and investment in growth.

39. During the question and answer portion of call, defendants were questioned as to what was driving Terminix's higher pricing, which defendant DiLucente claimed was due to favorable market conditions as reflected in the following exchange:

[Analyst:] Tony in your prepared remarks, I heard you mention termite pricing a couple of times being better. That's consistent with some of the survey

work that we've done recently on the pest control market. Can you just talk about what's driving the better pricing? Is that just Terminix kind of going out and getting what it feels it deserves, where it's been lacking? Or you do you feel just like the market is supportive of better pricing? Could you just sort of frame what's driving the better pricing? Because that's something that we're definitely seeing in our survey work.

[DiLucente:] Sure. Thanks, Seth. And I think the latter explanation you gave is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – would be bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily. So [a] pretty typical thing for us.

40. Also during the call, defendant Varty was questioned as to whether he was seeing any "new business trends" in "termite control," and if so, "how [they] [were] performing." In response, defendant Varty stated that ServiceMaster's "renewed efforts" were "starting to pay dividends," which was a "positive sign for [the Company's] termite business," stating in part:

I mean what we're seeing right now is based on our new – renewed efforts to focus heavier on preventive rather than just curative is starting to pay dividends. It's just an initial rollout of our bundled offerings. So this will take some time to take traction, but already our customers are appreciating in our pilot programs sort of what's happening. I'm also even more excited for the future where we're driving these clean sheet designs, and termite was the first program we picked up on where we're completely redefining, how we do business with our customers and completely reimagining the journey and touchpoints that we have. So I see a lot of good – and all of this new stuff that we're going to drive is only going to work if our service levels start creeping up. And seeing the NPS score month after month after month improving and also finally starting to see the cancellations turnaround is a very positive sign for our termite business.

41. On May 8, 2019, ServiceMaster filed its quarterly report on Form 10-Q for first quarter of 2019, which was signed and/or certified by defendants Varty and DiLucente. With regard to termite damage claims accruals, the Form 10-Q stated in part:

Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates.

We have certain liabilities with respect to existing or potential claims, lawsuits and other proceedings. We accrue for these liabilities when it is probable

that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

42. On August 6, 2019, ServiceMaster issued a release reporting its financial results for the second quarter of 2019. The Company raised its full-year revenue guidance to between $2,045 and $2,060 million and affirmed its full-year 2019 adjusted EBITDA guidance. In the release, defendant Varty touted the improvements at Terminix, stating in part:

> "Our relentless efforts on improving customer service and focus on employee performance capabilities enabled us to deliver strong organic revenue growth at Terminix, including the best organic growth we have seen in more than three years in our commercial pest service line. Improvements in customer retention and price realization drove growth across revenue channels, which more than offset the impact of unseasonable weather conditions."

43. That same day, ServiceMaster held a conference call with investors and analysts to discuss its second quarter 2019 financial results. On the call, defendant Varty praised Terminix for being able to offset weather-related issues that had arisen that quarter, referring specifically to Terminix Residential's President, Matthew J. Stevenson, and stating in part:

> I will start with the Q2 financial highlights on Slide 4. ServiceMaster delivered strong revenue growth in the second quarter as we continue progress on all of our strategic initiatives. We reported 8% revenue growth in the quarter, including 10% growth at Terminix and 2% growth at ServiceMaster Brands. Organic growth at Terminix was 4%, including 6% in Residential Pest, 4% in Termite & Home Services and 2% in Commercial Pest. Meaningful retention gains and pricing realizations across all service lines helped to offset lower new unit sales due to the unseasonal weather patterns in the quarter. I am very proud of the growth Matt Stevenson and our team delivered in face of a challenging environment this quarter, driving several measures anticipating and countering the impacts of weather.

44. Additionally, defendant Varty stated that the Terminix transformation plan was being executed successfully with a focus on customer service, stating in part:

> Our focus on customer service is continuing to strengthen our core, and Slide 6 provides an example of progress we are making across our businesses. Residential. Starting in Terminix Residential, our focus on the fundamentals is resulting in a measurable, better customer experience built on significant improvements in the basic blocking and tackling of our route-based business. For example, missed

appointments were down over 50% in the quarter versus [the] prior year. We are also making progress against our goal of speaking with customers before and after every service visit, allowing us to clearly explain the value of our services and set expectations for upcoming visits. We are also making meaningful improvement in the most important aspect of our business, our safety culture, with preventable accidents and injuries down 15% in the quarter. Returning our teammates home safely is our top priority every day. We have been able to make these strides while also improving labor productivity by $2 million year-over-year to enhance overtime management and a targeted initiative to move many hourly technicians to a production-based pay plan.

These initiatives helped drive a 4% reduction in Q2 year-over-year cancel rates in termite and residential pest control. We're also encouraged to see external confirmation of improving customer satisfaction through positive independent survey results over the last few months, one of which recently reported 91% customer satisfaction rate for Terminix, highest in the industry. While that kind of feedback is gratifying, we're not letting up. We know there is still considerable work ahead of us as we challenge ourselves against strong prior year growth numbers in the back half of this year.

45.     In discussing Terminix's incremental margins, defendant DiLucente reported a figure

of 5%, notwithstanding an increase in termite damage claims in the Gulf Coast, stating in part:

There was $2 million in increased damage claims expense primarily due to activity in the Gulf Coast region. We also had $4 million in dis-synergies in the quarter. Excluding the impact of $6 million of dis-synergies and SalesForce's investments in the quarter, the incremental margins for Terminix were approximately 5%.

46.     Defendant DiLucente additionally stated that the Company had "increased the bottom

end of [its] free cash flow guidance and now expect[ed] to convert adjusted EBITDA to free cash

between 55% and 60%."

47.     When questioned by analysts on the call about year-over-year trends by segment,

defendant Varty described Terminix as "definitely the driver" for positive margin trends in the

"second half of the year," stating in part:

Yes. We definitely have more margin improvement in the second half of the year in Terminix. I don't think there's a meaningful change in ServiceMaster Brands. And so that's – so Terminix is definitely the driver. And we have really consistently said that all along . . . we were going to see lower incremental margins in the first 2

quarters and we're going to slow – trend up particularly in the third and fourth quarter. So that's the main driver for that trend in the second half.

48.     Also on August 6, 2019, ServiceMaster filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2019, which was signed and/or certified by defendants Varty and DiLucente. The Form 10-Q contained the same language concerning the accounting practices for termite damage claims accruals as the first quarter 2019 10-Q detailed in ¶41 above.

49.     In addition, the Form 10-Q indicated that an increase in termite damage claims "was driven by increased termite warranty claims, primarily in the Gulf Coast region."

50.     The statements referenced above were materially false and misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations, which were known to defendants or recklessly disregarded by them:

(a)     that ServiceMaster's operations and financial results were suffering from severe Formosan termite activity, particularly in the Mobile, Alabama region;

(b)     that ServiceMaster had failed to effectively remediate or treat Formosan termite infestations suffered by its customers across the Mobile, Alabama region;

(c)     that ServiceMaster had incurred tens of millions of dollars in additional costs related to attempted remediation of Formosan termite damage and the payment of customer claims arising from such damage;

(d)     that ServiceMaster's financial results and business operations had been and were expected to continue to be materially adversely impacted by extraordinary Formosan termite activity;

(e)     that ServiceMaster had instituted a number of initiatives in early 2018, such as significant price increases among its customer base, designed to mitigate the adverse operational and financial trends that the Company was experiencing as a result of Formosan termite damage; and

(f)     that, as a result of the foregoing, defendants' positive statements during the Class Period regarding the purported success of ServiceMaster's Terminix segment and operational and financial results and trends were false and misleading and/or lacked a reasonable basis.

51.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, also required disclosure of any known events or uncertainties that had caused, or were reasonably likely to cause, ServiceMaster's disclosed financial information not to be indicative of future results.  The risks posed by the severe Formosan termite activity impacting the Company's services and related claims and litigation activity were known to defendants and were likely to (and in fact did) materially and adversely affect ServiceMaster's results and prospects.  The omitted material facts alleged herein were reasonably expected to (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.

52.     Then, on October 22, 2019, ServiceMaster announced disappointing preliminary financial results for the third quarter of 2019.  In addition to missing revenue and earnings estimates for the quarter, ServiceMaster reported net income of only $25 million as compared to $71 million during the third quarter of the prior year.  The Company also gave adjusted EBITDA guidance of $415 to $425 million, down from $435 to $445 million.  Further, the release also announced the sudden departure of the President of Terminix Residential, Matthew J. Stevenson.

53.     The release attributed the disappointing results to "termite damage claims arising primarily from Formosan termite activity" "concentrated in Mobile, Alabama," which had "been increasing over the last few years."  The Company further stated that these were known "trends" and that ServiceMaster had been taking measures to mitigate the trends since early 2018:

> The increase in termite damage claims includes the resolution of a single $2 million termite damage claim from 2016.  Termite damage claims can take years to fully settle, and timing can be difficult to forecast.  Assuming the continuation of recent trends, the company expects higher claims costs to continue in the short-term

due to increased claims activity. Formosan termite activity has been increasing over the last few years, however due to a number of climatic and environmental factors it remains largely concentrated in the Mobile, Alabama area of the country, which represents less than one percent of Terminix revenue. Starting in 2018, the company initiated mitigating actions to limit our future exposure, including third party claims management, reinforcement of effective processes, improved documentation, and a change in pricing structure. We have undertaken several other operational changes over the last 18 months and are confident that we can continue to manage the impact of termite damage claims within our projected long-term 30 percent incremental margins.

54.     The release further indicated that the Company's reduction in adjusted EBITDA guidance had been impacted by several factors, including a "$10 million reduction from the impact of termite damage claims" and "$10 million from targeted revenue reductions principally in the Mobile, Alabama area." The release also stated that ServiceMaster had suffered "a reduction in termite renewals driven partially by managed reductions from price increases in the Formosan termite market of Mobile, Alabama."

55.     On this news the price of ServiceMaster share dropped $11.44 per share to close at $44.70 per share on October 22, 2019, a decline of over 20% on unusually high trading volume.

56.     Then on November 5, 2019, ServiceMaster issued a release announcing its final third quarter 2019 financial results, which largely matched the October 22, 2019 preliminary third quarter 2019 financial results. In the release, the Company discussed its "'challenging quarter,'" revealing that it had been impacted by certain "legacy risks," including "termite damage claims."

57.     That same day, defendants held a conference call with investors and analysts to discuss the results. On the call, defendants gave more information concerning the termite damage claims suffered by the Company. Specifically, defendant Varty informed the market that the uptick in claims – which he revealed had occurred "[i]n the past few years" – had increased termite damage claims costs and impacted termite revenue by 7% to 8%, up from the historic numbers of 4% to

4.5%. Defendant Varty also stated that the increased claims would continue to impact the Company throughout 2020, stating in part:

> The profitability levels of the business have historically included spending approximately 4% to 4.5% of termite revenue annually in the settlement of these termite damage claims nationally. And the base of our business outside of the Mobile, Alabama area continues to operate at these historical levels. Most of these claims are handled directly with the customer and involve relatively minor repairs, but a few occasionally involve litigation and the payment of damages.

> In the past few years, we have seen an increase in the number and average cost of termite damage claims in the Mobile, Alabama area related to Formosan termite activity. We also have seen an increase in the number of termite damage claims in that region that involves litigation. These 2 trends have increased our termite damage claims cost as a percentage of termite revenue to between 7% and 8%. Given the increased volume we have seen, we expect additional cost increases in 2020 before our mitigating actions fully take effect and we begin to gradually return them to historical norms.

58.     In addition, defendant Varty disclosed that the price increases in Mobile, Alabama were part of an initiative to "mitigate" termite damage claims by "limit[ing] [the Company's] legacy risk exposure." Further, defendant Varty stated that only now was ServiceMaster employing a "quality assurance team" to oversee the inspection and retreatment associated with customer contract renewals, stating in part:

> At the beginning of 2019, we began a pricing initiative in the Mobile, Alabama area to better align the cost we . . . charge termite customers with the actual cost we incur to provide services in the area. We anticipated some customer reductions as a result of the pricing change, but they have accelerated faster than we originally projected and, as a result, are impacting termite renewal revenue and profitability in the short-term. As these customers renew their contracts, we conduct a detailed inspection and when necessary, re-treat their properties. We have added a dedicated quality assurance team that is solely devoted to these inspections and re-treatments.

> Another key initiative was to increase awareness of these issues in the area and train technicians more effectively on inspection methods to identify and document aspects of Formosan termite activity that are different from subterranean termites. The inspection and documentation process is vital to ensure we set customer expectations regarding property damage that may predate our treatment and conducive conditions that may limit our treatments' effectiveness.

- 18 -

Another action we have taken is to improve our claims management process through a third-party administrator. This administrator helps us settle any new claims that may arise at a faster pace than our historical norms.

59.     Finally, defendant DiLucente stated that, in addition to "$2 million in increased damage claims expense due to the increased Formosan termite activity in Mobile, Alabama," the Company "expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter."

60.     On this news, the price of ServiceMaster shares declined 9% on November 6, 2019 on unusually heavy trading volume.

61.     On January 21, 2020, ServiceMaster issued a release announcing the abrupt departure of defendant Varty as CEO, effective immediately. The reason given for defendant Varty's sudden resignation was that he was leaving "to pursue other opportunities."

62.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased ServiceMaster stock at artificially inflated prices and were damaged when the relevant truth was revealed.

## LOSS CAUSATION AND ECONOMIC LOSS

63.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ServiceMaster stock and operated as a fraud or deceit on purchasers of ServiceMaster stock. As detailed above, when the truth about ServiceMaster's misconduct was revealed, the price of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The declines in the price of ServiceMaster stock were the direct result of the nature and extent of defendants' fraud being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts

unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant declines in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

64. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of ServiceMaster's business, operations, and financial results as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and/or omitted material facts necessary to make the statements made not false or misleading, causing the price of ServiceMaster stock to be artificially inflated. Plaintiff and other Class members purchased ServiceMaster stock at those artificially inflated prices, causing them to suffer damages as complained of herein when the relevant truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

65. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     plaintiff and other members of the Class purchased ServiceMaster stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

66.     At all relevant times, the market for ServiceMaster stock was efficient for the following reasons, among others:

(a)     ServiceMaster stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     as a regulated issuer, ServiceMaster filed periodic public reports with the SEC; and

(c)     ServiceMaster regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**NO SAFE HARBOR**

67.     Defendants' false or misleading statements issued during the Class Period were not forward-looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

68.     ServiceMaster's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

69.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of ServiceMaster who knew that the FLS was false.  Further, none of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic

performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on behalf of all purchasers of ServiceMaster common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

71. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ServiceMaster stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class located geographically throughout the country. Joinder would be highly impracticable. Record owners and other members of the Class may be identified from records maintained by ServiceMaster, its transfer agent, or securities brokers and custodians. Class members may be notified of the pendency of this action by mail and/or electronic communications, using the form of notice similar to that customarily used in securities class actions.

72. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

73. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

74. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants acted knowingly or recklessly in issuing false and misleading statements;

(c)     whether the price of ServiceMaster stock was artificially inflated during the Class Period because of defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

76. Plaintiff incorporates ¶¶1-75 by reference.

77. During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ServiceMaster common stock during the Class Period.

79.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ServiceMaster stock, and suffered losses when the relevant truth was revealed.  Plaintiff and the Class would not have purchased ServiceMaster stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

80.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of ServiceMaster stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

81.     Plaintiff incorporates ¶¶1-80 by reference.

82.     During the Class Period, the Individual Defendants acted as controlling persons of ServiceMaster within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about ServiceMaster, the Individual Defendants had the power and ability to control the actions of ServiceMaster and its employees.  ServiceMaster controlled the

Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, designating plaintiff's counsel as Lead Counsel, certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 1, 2020          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                     CHRISTOPHER M. WOOD, #032977

                                          CHRISTOPHER M. WOOD

                         414 Union Street, Suite 900
                         Nashville, TN 37219
                         Telephone: 615/244-2203
                         615/252-3798 (fax)
                         cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

TEAMSTERS LOCAL 237 WELFARE FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Holwill v. AbbVie Inc., et al.*, No. 18-cv-6790 (N.D. Ill.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SERVICEMASTER

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _1st_ day of June, 2020.

Teamsters Local 237 Welfare Fund

By: _____
Mitchell Goldberg, Director

SERVICEMASTER

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/20/2019 | 465 | $53.64 |
| 09/12/2019 | 180 | $56.03 |

Prices listed are rounded up to two decimal places.